# OSBORNE v. SAN DIEGO LAND AND TOWN COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF CALIFORNIA.

No. 201. Argued March 19, 1900. — Decided May 14, 1900.

The appropriation and disposition of water in California is a public use, and the right to collect tolls or compensation for it is a franchise, subject to regulation and control in the manner prescribed by law, and such tolls cannot be fixed by the contract of the parties.

It is not for the court to go into the reasonableness of the established rates, which are sought to be enforced in this case, but if the consumers are dissatisfied with them, resort must first be had to the body designated by law to fix proper rates, the board of supervisors of the county.

THIS was a bill in equity to review and reverse a decree entered in the United States Circuit Court for the Southern District of California in a suit in which Charles D. Lanning, receiver of the San Diego Land and Town Company of Kansas, was complainant, and appellants herein were respondents, and in which the appellee was substituted before decree as complainant in lieu of said Lanning.

The bill is extremely voluminous, reciting all the pleadings and proceedings in the original suit.

The following is a condensed summary of them :

The bill, in addition to the incorporation of the company and the appointment of a receiver of its assets and affairs, alleged that it was the owner of valuable water, and water rights, reservoirs and an entire water system for furnishing water to consumers, and that it had a franchise for impounding, sale and disposition of the waters owned and stored by it to the respondents and other consumers, and to the city of National City and its inhabitants.

The company's supply of water came from the Sweetwater River, a small stream about five miles from the city of National City, and its means of distributing the water, which were de-

scribed, could supply but a limited amount of territory, consisting of farming lands within and outside of said city, and in part of the residence portion of the city.

The company in procuring the water and its distributing system had expended up to January 1, 1896, the sum of $1,022,473.54, which was reasonably necessary for the purposes.

By the said expenditure it had procured and owned, "subject to the public use and the regulation thereof by law," water and water rights, a reservoir site, and a reservoir of the capacity of six thousand million gallons, and had constructed mains necessary to supply the defendants and their lands, and had constructed and put in the mains and pipes necessary therefor, and was at the time mentioned in the bill furnishing the defendants and each of them with water.

The defendants are the owners respectively of tracts of land under the system of the company, most of them of only a few acres each, and each became the owner of a water right to a part of the water of the company necessary to irrigate his tract of land, and became liable to pay for a yearly rental such as the company was entitled to charge and collect.

The annual expense of the system and its operation, including interest on its bonds, and excluding the natural and necessary depreciation, was $33,034.77, and to pay this expense and income of six per cent on the amount invested on the 1st of January, 1896, it was necessary that the rates for water be fixed to realize $119,791.66.

The amount realized outside of the city of National City for that year was about $15,000, and no more than that sum could be probably realized for the year ending January 1, 1897.

The mains and pipes were perishable, and required to be replaced at least once in sixteen years, and required frequent repairs.

To acquire the water and construct the system, the company was compelled to borrow $300,000, and to pay interest in the sum of $21,000 annually, which must be realized from the sale of its water, and was part of its operating expenses, and the share of its revenues which should be raised in the city of National City was about one third, and the amount which could

be raised from said city at the rates which prevailed under the ordinance mentioned in the bill was about $10,715 per annum, and no more.

The value of its water franchises and system was one million one hundred thousand dollars.

No other person or corporation was furnishing water to defendants, nor was there any other system by which they could be furnished, but the franchises and the rights of the company were not exclusive.

The city of National City was a municipal corporation of California, of the sixth class, and the board of trustees thereof, claiming to act under the constitution and laws of the State, passed an ordinance fixing the rates to be charged for water sold and furnished by the company to consumers of the city.

The company commenced to furnish water in the year 1887, and was informed by its engineer that its system and supply of water would furnish to consumers sufficient to irrigate twenty thousand acres, and in addition what would be necessary for domestic use inside and outside of said city. The company was unfamiliar with the operation of the plant and system constructed and the cost of operating and maintaining them, and relying upon the estimates of the engineer, and believing that an annual rate of $3.50 per acre would be sufficient, fixed the rate at such sum, and had charged it until January 1, 1896, but instead of being able to supply sufficient water to irrigate twenty thousand acres, it had been demonstrated by actual experience that the system would not supply sufficient to irrigate, to exceed seven thousand acres, together with water demanded for domestic use, and it was believed not to exceed six thousand acres, although there were about ten thousand acres under the system susceptible of irrigation.

At the rate of $3.50 per acre, even if all the lands of the system should be supplied with water and the rates in National City should be maintained, the company would not be able to pay operating expenses and maintain its plant, and the money invested in it would be lost, and the company would be compelled to furnish water at a loss, as it had been furnishing water at a loss, and its system had been going gradually to decay con-

sequent upon the want of revenue and means to replace the same.

To pay cost of operating and maintaining its system and a reasonable interest it was necessary to charge $7.00 for irrigation purposes, and said sum was a reasonable rate for consumers to pay, and the smallest amount for which the company could furnish water without loss.

By the laws of California the board of supervisors might upon petition of twenty-five inhabitants and taxpayers of the county fix the yearly rental for water, but no such petition had been presented or rates fixed in the case of the company.

For the reasons above stated the company gave notice to the defendant that on January 1, 1896, it would establish a rental of $7.00 per acre.

The defendants and each of them refused to pay such sum, and maintain that neither the company nor its receiver had the power to increase the rental, and that the former rate must be and remain the rental until the board of supervisors establish one as provided by law.

The increase of the rental was absolutely necessary to maintain and operate the plant.

To enforce the rental the complainant caused the water to be shut off the premises of each of the defendants, and each of them threatened and would, unless restrained by the court from doing so, commence a suit in the Superior Court of San Diego County, California, to compel complainant to turn on and furnish water again, claiming the use for $3.50 per acre, and for damages. The rights of the defendants and the determination of the question of the right of the company would affect all in the same way and extent, except the quantity of land owned by the several defendants was different.

The bringing of said suits would involve complainant in a multiplicity of suits, would hinder him in the operation of the property of the company and the settlement of its debts and obligations, and the questions involved could better be settled in one suit.

The increase in rates would add to the revenue of the company with the amount of land now under irrigation, not less

than $14,000 per annum, and upon the whole of the land which could be irrigated not less than $20,000 per annum.

There were allegations of the legal character of certain of the defendants, and the bill concluded with the following prayer:

"Wherefore your orator prays your honors to grant to him the writ of injunction against the defendants and each of them, enjoining them from prosecuting in the state courts or elsewhere separate actions against your orator or said land and town company; that said defendants and each of them be required to appear in this suit and set up any claims they may have against the right of your orator or said company to increase the rental for water furnished by said company, as aforesaid, and that it be finally decreed by this court that your orator, as such receiver, and said company have the right to increase the amount of its rentals to any reasonable sum, and that the sum of $7.00 per acre per annum is a reasonable rental to be charged, and that the defendants and each of them be required to pay said rate as a condition upon which water shall be furnished to them, and that your orator shall have generally such other and further relief as the nature of his case may require."

The answer was very long and somewhat confused by repetitions. The substance of it is given in the opinion of the Circuit Court. 76 Fed. Rep. 319.

It is sufficient for the purpose to say that its allegations and defences were based on the claim that the supply and system of the company were subject "to the water rights, easements in and servitudes upon said reservoir and system, and to all other rights acquired by these defendants therein . . . and annexed to the respective parcels of lands of these defendants. And also each such water right and easement was in freehold and was a freehold servitude imposed upon said water system for the benefit of the land to which it was appurtenant, and that all claims and demands of said company for the price or compensation therefor had been paid or otherwise satisfied by purchase or otherwise, as in the bill of complaint alleged." And such rights extended to and included the right to have the company maintain that system efficiently to conduct the water to the premises of each of the defendants for irrigation, and other

uses, at "the annual rates to be deemed and accepted as the legally established rates therefor under the facts hereinafter set forth."

These facts were, besides those stated in the opinion, that each defendant and all of them paid the full amount demanded by the company as the price of the perpetual easement of water supply from the system granted and annexed to their lands, and that they were forever discharged from the payment of any further sum to apply on the principal of or as income upon the cost or value of the system or debt incurred for its construction or the value of their respective water rights. And that in these respects the company had put all lands on an equal footing, and they had remained on the same footing for more than five years, and in many cases had changed hands; that the value of the water rights had for more than five years entered into the market value of the lands and the price paid to their vendors by the defendants, who were their successors in title, and they were induced to purchase, improve and settle upon their respective parcels on account of the rate of $3.50 per acre per annum, and it entered into and became a material element of their value.

That by the constitution of the State of 1879, it is provided in article XIV, section 1, among other things, as follows, to wit:

"The use of all water now appropriated, or that may hereafter be appropriated, for sale, rental or distribution, is hereby declared to be a public use, and subject to the regulation and control of the State, in the manner to be prescribed by law."

"Sec. 2. The right to collect rates or compensation for the use of water supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law."

And in pursuance of the provision the legislature passed an act approved March 12, 1885, entitled "An act to regulate and control the sale, rental and distribution of water in this State other than in any city, city and county, or town therein, and to secure the rights of way for the conveyance of such water to the places of use."

The act provided that the sale and distribution of appropriated water was a public use, and the right to collect compensation therefor a franchise, and, except when furnished by a city or town, should be regulated and controlled by the board of supervisors of the counties of the State in the manner prescribed, and that the board might establish different rates as the case might be, and different rates for the several different uses, such as mining, irrigating, etc., for which the water should be applied, and the rates fixed should be binding and conclusive for a year, until established anew or abrogated. And it was provided that until the boards of supervisors establish rates, the rates "actually established and collected . . . should be deemed and accepted as the legally established rates."

That the rate of $3.50 per acre was the only actual rate for irrigation which had ever been established and collected by the company or its receiver, or assented to by consumers.

That they each had since January 1, 1896, paid the rate of $3.50 per acre to the complainant as receiver, and were willing and offered to pay the same as long as it should be legally established. And it was averred that in so far as the act of 1885 purported to prohibit the company from the sale of servitudes in freehold upon its system, or to contract respecting the same, or to receive full compensation from any consumer therefor who was willing to contract for the same, and to prescribe that such easement should be used only upon the terms and conditions that the owners render net annual receipts and profits upon the value thereof in perpetuity, or to prohibit contracts respecting the annual receipts, or to extinguish and satisfy the right of the company to such net annual receipts, the same was unconstitutional and void, and in conflict with the Fourteenth Amendment of the Constitution of the United States, and section 1, article 9, of the constitution of the State.

That the liability of the defendants to pay rates was several, not joint, and that certain of the defendants were not residents of the State, certain others not residents of the county of San Diego and others were school districts, and that none of them were competent to make petition to the board of supervisors, as required in the act of 1885, and said act, as far as it pur

ported to authorize the company to increase the rates of $3.50 per acre, was in violation of the Fourteenth Amendment of the Constitution of the United States, and deprived each of them of his or her property without due process of law, and to each of them the equal protection of the laws.

That in so far as the statute of 1885 purported to authorize the company to shut off water from the lands of defendants or to increase the rate without consent of the defendants, or to permit its collection without giving the defendants a standing in court to contest the reasonableness of the increase, was also in violation of said Fourteenth Amendment. And, also, that the complainant, by shutting off water, violated that amendment.

The bill of review then averred that there were exceptions taken to the answer on the ground that it did not set forth or discover relative and material matters of fact tending to show that the bill was not true or in confession or avoidance thereof, but instead set forth immaterial and irrelevant matter.

Each exception was specific, but altogether they went to the whole answer except its admissions and certain of its denials.

It was prayed that the defendants be compelled to amend the answer, and to put in a full and sufficient one.

The exceptions coming on to be heard, they were sustained — the defendants excepted.

By order of the court, on motion of complainant, Charles D. Lanning was discharged as receiver, and the San Diego Land and Town Company of Maine was substituted as complainant — defendants excepted.

A notice was given of a motion to be made that the bill in the suit be taken *pro confesso*, and a decree of the court be taken accordingly, on the ground that the exceptions to the answer had been sustained and no amended answer had been filed within the time allowed.

The motion came on to be heard, and pending its hearing, the defendants gave notice of a motion to dismiss the suit on the ground that the receiver had been discharged, the property had been sold under foreclosure, and had passed into the hands of another corporation; that the San Diego Land and Town Com-

pany of Maine was not the successor of the receiver, and had no interest or right to prosecute the action, and that the board of supervisors of San Diego County had fixed the rates of the company.

The two motions came on to be heard on the 2d of January, 1898, and the motion to dismiss was denied, and the motion that the bill be taken *pro confesso* against all the defendants was granted, and a decree ordered to be entered according to the opinion of the court. The defendants excepted.

The bill of review further averred that the court caused to be entered, greatly to the prejudice of the orators, its decree, which was set out at length. It further averred that the defendants had paid the costs adjudged against them, and detailed at length their exceptions to the ruling of the court. The exceptions reasserted the materiality and sufficiency of the averments of the answer, contended that the court misapprehended them, and erroneously treated and considered the exceptions as raising for discussion the merits of the case, and by expunging the answer from the records, deprived the defendants of the right to have the merits of their defences on their face regularly determined upon the setting of the cause for hearing on bill and answer or upon issues raised and proofs made.

The bill of review asserted further errors against the decree in that it denied the rights alleged in the answer of defendants, and so construed and enforced the constitution and statutes of the State as to violate section 1, article 14, of the Constitution of the United States, in that it maintained the company and the receiver in increasing the rate, and the condition of non-payment the right to shut off the water from the lands of the defendants, and thereby deprived them of the equal protection of the laws and of their property without due process of law. And further, because it was an exercise of judicial power to the same end, and to the deprivation of the right of contract without due process of law. Also denied to the State a republican form of government, guaranteed by section 4, article 4, of the Constitution of the United States, in that, as enforced and applied, the State assumed the absolute control of all water

appropriated and all works for its distribution, abolished capacity to acquire property, rights and servitudes in such water and waterworks absolutely, or with ownership of lands for irrigation, or free from the perpetual obligation to pay net revenue of not less than six nor more than eighteen per cent per annum upon the cost or value of the water system ; and abolished the right or capacity to ascertain, fix or define, by contract or convention, the rate of compensation to be paid by any consumer for the supply of water for irrigation of land.

Error was also asserted in the decree in that it was in favor of the San Diego Land and Town Company, of Maine, although it had not become a party to the cause, by supplemental bill or otherwise, and because what interest it had did not appear, nor was its claim to any interest set forth, so that the defendant could answer or plead thereto. Also, error in that the court had no jurisdiction to entertain the cause or make any decree on the merits, and error in not dismissing the suit after the discharge of Lanning, the receiver and complainant.

The bill concluded with the following prayer :

" Wherefore, as said errors appear on the face of the record, and are greatly prejudicial to complainants and their rights in the premises, complainants pray that said decree may be reviewed, reversed and set aside, and no further proceedings taken therein ; and to that end complainants pray process by subpœna against the San Diego Land and Town Company, of Maine, requiring it to appear and answer hereunto, and show cause, if it may, why said decree should not be reviewed, reversed and set aside, and such further orders and decrees be made as to the court may seem just, including the restoration to your orators of the sum of money paid under said decree, as aforesaid."

The defendant (appellee) moved the court to strike the bill from the files and dismiss the suit.

The motion was denied. The water company then demurred to the bill on the grounds that it appeared therefrom that there was no error in the proceeding and decision in *Lanning* v. *Osborne*, appearing on the face of the record or otherwise; that complainants were not entitled to the relief prayed for, or any relief ; that no error appeared in said suit which could be re-

lieved by a bill of review or a bill in the nature of a bill of review; that the remedy of complainants was by appeal.

The demurrer was sustained with leave to complainants to amend the bill in ten days.

The complainants elected to stand on their bill, and decree was entered on the demurrer as follows:

· " It is therefore considered and decreed by the court that the plaintiffs take nothing by their bill herein; that said bill be, and the same is hereby, dismissed, and that the defendant have and recover of and from the plaintiffs its costs in this behalf laid out and expended, taxed at $20.50."

The case was then brought here.

*Mr. Alfred Haines* for appellants.

*Mr. John D. Works* for appellee. *Mr. Lewis R. Works, Mr. Bradner W. Lee* and *Mr. Charles D. Lanning* were on his brief.

*Mr. John Garber* and *Mr. Frank H. Short* filed a brief as *Amici Curiæ.*

MR. JUSTICE MCKENNA, after making the above statement, delivered the opinion of the court.

One of the grounds of demurrer to the bill was that it appeared from the complainants' own showing that their remedy was by appeal and not by bill of review. It is not pressed with much earnestness here, and is clearly untenable. *Whiting* v. *United States Bank,* 13 Pet. 6; *Putnam* v. *Day,* 22 Wall. 60; *Buffington* v. *Harvey,* 95 U. S. 99; *Ensminger* v. *Powers,* 108 U. S. 292; *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1; Story's Equity Pl. 10th ed. sec. 403 *et seq.*

The principal contention of the appellants is that the water rights are easements in the real estate constituting the water system. In other words, (as described by appellants) " incorporeal interests in the corporeal property of a water system annexed to lands irrigated by that system." Being such, the corporation may sell them, the land owner may contract for them

— may buy them outright and free himself wholly from annual rates, or may stipulate for a particular rate. In other words, that the water right is an interest in the system, paid for with the land, or by the stipulated rate, and not subject to any rate or to increase beyond the stipulated rate, according to the varying expenses or valuations of the system.

It is claimed to be property, and the right to sell and to buy it is asserted respectively for the owner of the system and the consumers of its waters, and that the constitution and laws of the State of California do not prohibit this, or if they can be construed to do so, violate the Fourteenth Amendment of the Constitution of the United States by depriving appellants of their property without due process of law, and violate also certain provisions of the constitution of the State of California.

It is further contended by appellants that conceding a contract cannot be made between " water corporations" and their customers for a particular rate which will preclude regulation by the State, that until such regulation the parties—company and consumers—may contract. And, further, that the rate of $3.50 per acre per annum was the rate charged and collected by the company, and therefore became the rate established by law by virtue of a provision in section 5 of the statute of 1885, hereafter quoted.

It is also contended that the answer in the original suit averred the rate of $3.50 per acre per annum was a reasonable rate, and denied that the increased rate of $7.00 per acre was reasonable, and that on the issue thus raised, the defendants there, complainants in the bill of review, were entitled to a hearing.

The charge of error in the decrees is based on their adjudging against these contentions.

Opposing the contentions of appellants, the appellee makes a distinction between the facilities for the use and the right to use the water of its system and the actual use of it. The compensation for the former, appellee concedes may be the subject of contract; the rate for the latter, it contends, is subject to reg-

ulation by law, but, until so regulated, may be established by the water companies.

The Circuit Court did not accept the distinction made by appellee. It did not accept the view contended for by appellants. It held, interpreting the constitution and laws of the State, that the appropriation and disposition of water was a public use, the right to collect tolls or compensation for it a franchise, subject to regulation and control in the manner prescribed by law, and that such tolls and compensation could not be fixed by the contract of the parties.

If the contention of the appellee is justified, that the contracts between it and the appellants gave it the right to establish the rates, the controversy is narrowed and simplified, and we are relieved from deciding the many interesting and difficult questions pressed by appellants for judgment.

There was some difference in the way the water rights of the defendants arose, but they are assimilated in the same legal right by the allegation in the original answer, that the company did " not make or claim any distinction in respect of the character and quality of the water right, or of the annual rates actually established or collected for irrigation."

It is only necessary, therefore, to say in description that some of the lands were purchased before 1892, and up to that date there was no express or separate grant of " water rights." Some were purchased after 1892, and as to them there was a specific sale of the appurtenant water right. The contracts in both cases contained an agreement to sell certain described real estate, " together with a water right to one acre foot of water per annum for each and every of said above described real estate, to be delivered by the party of the first part through its pipes and flumes at a point — said water to be used exclusively on said real estate, and not to be diverted therefrom. Provided, that the party of the first part may change the place of delivery of said water, so long as the same is near the highest point of said land. For which land and water right the party of the second part agrees to pay the sum of — dollars."

The contracts also contained the following provisions :

" And the party of the second part further agrees and binds

—self, — heirs, executors and assigns to pay the regular annual water rates allowed by law and charged by the party of the first part for water covered by said water rights, whether such water is used or not, and to pay for all water used on said land for domestic purposes, monthly, under such rules and regulations for the delivery of water to consumers, as the party of the first part may from time to time make."

Other lands (about nine hundred acres) described in the answer as "lying outside of National City" were derived, not from the company, but water rights were attached to them on the same basis as to the lands sold by the company up to 1892. After that date the company refused to furnish water, except upon the payment of a sum in gross for the water right over and above the uniform annual rate established and collected, or in lieu thereof six per cent annual interest upon the company's estimate of the value of such right. The price was first fixed at fifty dollars, afterwards at one hundred dollars, and the contract in addition providing for the sale of the water right contained the following provision:

"In consideration of the foregoing stipulations and agreements, the party of the second part agrees and binds — self, — heirs, executors and assigns, to pay the sums above specified promptly as the sums, and each of them, falls due, and that — will in all things comply with and perform the terms and conditions of this agreement on — part to be performed, and that, — and they will promptly pay all annual water rates and charges for the water to which — is entitled under and by virtue of this agreement, at rates fixed by the party of the first part as allowed by law, and at the times, in the manner, and according to the rules and regulations made and adopted by the party of the first part, the annual rental for the amount of water to which the party of the second part is entitled under this contract, to be paid whether the same is used or not, and also to pay for all water used by — on said land for domestic purposes at the rates fixed by the party of the first part and allowed by law."

Under the same form of contract water rights were attached to about four hundred acres of lands belonging to other defendants.

To lands which lay in what is designated Ex-Mission the con-tracts contained the following provision :

"The parties of the first part will make application for the use of the water upon the form provided by the party of the second part for that purpose, and pay for the use of the water at the current rates as may be enforced from time to time for supplying lands in National Ranch, and subject to the same general rules and regulations."

J. M. Ballow, one of the defendants, claimed his water right under a contract, which provided as follows :

"Provided, that said party of the second part shall make application in the form provided by the company, for the use of the water, and use the same under the same restrictions and conditions, and to pay said party of the first part the current rate therefor, as established, for Chula Vista; provided, said restrictions and conditions are not inconsistent with the water right hereby granted to said party of the second part."

The rates in Chula Vista were governed by the general contract.

It is apparent that the contracts in all things substantial to the controversy are similar. They provide for the payment of a certain sum for land and water rights, or for water rights alone, and all for the payment of annual rates besides. And provide directly or by reference that the annual rates shall "be fixed by the party of the first part, (the company,) as allowed by law," to be paid whether the water is used or not. Water used for domestic purposes is also to be paid for "at the rates fixed by the party of the first part and allowed by law."

These provisions do not leave much room for construction. For irrigation purposes and for domestic purposes the rental of water is to be paid at rates "fixed" by the company. The only qualification is "as allowed by law." What this means we shall presently consider; but whatever it means, it does not sustain appellant's contention that the rate of $3.50 per acre per annum was irrevocable, secured to them free from the power of variation by the company or by law. It is not important to consider, therefore, whether, under the constitution and laws of the State, they could contract with the company for the price

of a water right. If the contract, they plead, gives to the company the power to fix the annual rate, the only inquiry which need be, is whether the power has been exercised " as allowed by law." What this means can be the only controversy.

The appellee concedes the power of the regulation of rates by the board of supervisors, but claims that until the power is exercised the right to fix the rates rests with it, and that those fixed by it are " allowed by law." The appellants contend that the power of the board of supervisors is only a power to fix maximum rates, and below them the right of the parties to contract is unrestrained, (a view sufficiently discussed already,) and that until the board shall act " the statute itself fixes the standard of maximum rates, as being the ' actual rates established and collected by the corporation,' and forbids the corporation to exceed such maximum."

The contention is claimed to be based on section 5 and section 8 of the act of 1885. Section 5 vests the power to fix rates in the board of supervisors, and provides " when so fixed by such board shall be binding and conclusive for not less than one year next after their establishment, and until established anew or abrogated by such board of supervisors as hereinafter provided." And then follows the provision upon which appellants especially rely :

" And until such rates shall be so established, or after they shall have been abrogated by such board of supervisors, as in this act provided, the actual rates established and collected by each of the persons, companies, associations and corporations now furnishing, or that shall hereinafter furnish, appropriated waters for sale, rental or distribution to the inhabitants of any of the counties of this State, shall be deemed and accepted as the legally established rates thereof."

Section 8 provides that those furnishing water " shall so sell, rent or distribute such waters at rates not exceeding the established rates fixed and regulated therefor by the boards of supervisors of such counties, or as fixed and established by such person, company or association, or corporation, as provided in this act."

The deduction which appellants make is that when the com-

pany once fixes the rates they must remain so fixed, and if changed by supervisorial action recur upon the cessation of that action—inevitable always through every change of condition; if excessive, to forever remain so; if deficient, to forever remain so.

The argument urged to support this is that one of the ordinary meanings of the word "actual" is "existing at the time." "And if" (to quote counsel) "the lexicographer be consulted to define the word establish he will give its meaning substantially, as does the Century Dictionary, to be 'to make stable; firm or sure; appoint; ordain; settle or fix unalterably.'" To illustrate the immutability which one of its senses convey, counsel quote with apologetic reverence an illustration, which they say is often found in standard dictionaries: "I will establish my covenant with him for an everlasting covenant." Gen. xvii: 19.

We are not impressed with the aptness of the illustration to the case at bar.

Covenants formed and promulgated by a divine wisdom and foresight can have the attribute of immutability, and their language may be used and interpreted to express it. Human regulations are for the most part occasional and temporary. Besides, one definition of a word does not express its whole meaning or necessarily determine the intention of its use. If so, interpretation would not be difficult, and the application of the language of a law or contract would be as unerring as easy.

"Actual," of course, means existent, but it does not preclude change. Nor does the word "establish" convey the idea of permanency. As used in the statute, it has no such meaning. The power of the board of supervisors is not exhausted by one exercise, nor has its result unalterable fixity. It is beyond change only for a year. The language of the statute is "at any time after the establishment of such water rates by any board of supervisors of this State the same may be established anew or abrogated in whole or in part by such board, to take effect at not less than one year next after such first establishment. . . ."

It is manifest to construe the word "establish" to mean "to

fix unalterably," would throw the powers of the board of supervisors into confusion and contradiction.

To say that the rates are unalterable for a year would prove nothing. Such effect comes, not from the use of the word "establish," but from other words, and, but for them, rates established might "be established anew," as often as the board of supervisors might choose. Nor can it be said that the word means one thing when applied to the power of the board of supervisors, and another thing when applied to the power of the company. To say so is to abandon the argument. That depends upon the meaning of the word "establish" to be "to fix unalterably"—to mean of itself, and in its use, permanence and unchangeability. If it does not mean that of itself, there is an end of the argument, for there is nothing in the act or its purpose which would give it such meaning when expressing the power of the company, and something else when expressing the power of the board of supervisors. The purpose of the act rejects such view. Its purpose is regulation, deliberate and judicial and periodical regulation by a selected tribunal, and we cannot believe that the legislature intends by an absolute and peremptory provision to fix rates upon the water companies unalterable by them, no matter what change in conditions might supervene. Against rates which may become unreasonably high, the statute gives relief to consumers through petition to the board of supervisors. Rates which may become unreasonably low, it surely does not intend to impose on the companies forever, except as relief may come from the voluntary justice of its customers or by a violation of the statute and appeal to the courts. There is nothing in the act to indicate such purpose, nor does it need to have such purpose. Its dominant idea is the regulation of rates by law, not commanded to be exercised by the governing bodies as a voluntary duty as establishing rates in cities and towns, but exercised when invoked by petition. Until the necessity of that, what more natural and just than to leave the right with the water companies and recognize it as legal. This is the meaning, we think, of the provisions of sections 5 and 8, *supra*. To so interpret them makes the scheme of regulation complete—adequate, without being meddlesome or

oppressive. The power of regulation is asserted and provided for, and ready to be exercised to correct abuse, and who doubts but that its exercise would be invoked.

The appellants assign many errors upon the action of the Circuit Court in sustaining the exceptions to the answer made in the original suit. It would extend the opinion to too great length to consider them separately. They are reduced to and depend upon the claim that they constituted a submission of the case on bill and answer, and if the latter traversed any material allegation of the bill it could not be taken *pro confesso*, and a decree entered upon it would be erroneous. *In re Sanford Fork & Tool Co., Petitioner*, 160 U. S. 247.

The application of the principle is claimed upon the ground that the answer denies that the rate of $3.50 per acre per annum is unreasonable or that the increased rate of $7.00 per acre is reasonable.

The Circuit Court held that issue was not open to its decision. It said that if the rates established by the board of supervisors were unreasonable they could only be annulled. In no case would the court fix them. " Therefore," it was further said, " it is not for the court in the present case to go into the question of reasonableness of the rates established by the complainant, and which it seeks to enforce. If unreasonable, and the consumers are for that reason dissatisfied therewith, resort must first be had to the body designated by the law to fix proper rates, to wit, the board of supervisors of San Diego County."

We concur in this view, and finding no error in the decree it is

*Affirmed.*