**THE CATHOLIC UNIVERSITY OF AMERICA, Plaintiff,**

v.

**THE UNITED STATES, Defendant.**

No. 01–266 C.

United States Court of Federal Claims.

July 26, 2001.

**796**

Thomas P. Humphrey, Crowell & Moring LLP, Washington, D.C., attorney of record for plaintiff. Richard J. Bednar, John E. McCarthy, Jr., and Amy E. Laderberg, of counsel.

Mark L. Josephs, with whom were Acting Assistant Attorney General Stuart E. Schiffer, Director David M. Cohen, Assistant Director Mark A. Melnick, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., Special Counsel Tara A. Osborn, Associate General Counsel Nicole D. Bayert, Department of Defense, Office of General Counsel, Washington, D.C., and Major Gerald Q. Brown, Air Force Legal Services Agency, Commercial Litigation Division, Arlington, Virginia, for defendant.

## OPINION

WIESE, Judge.

This is a suit for injunctive and declaratory relief. The Catholic University of America ("the University") asks that we enjoin the Armed Forces Retirement Home ("AFRH" or "the Home") from proceeding with a solicitation seeking proposals for the development, lease, and possible future sale of a 49–acre tract of undeveloped federal land located adjacent to the University's campus in Washington, D.C. ("the property"). Absent the granting of injunctive relief, the University argues, it will suffer irreparable injury because it will lose the opportunity to exercise what it alleges is a statutory right to acquire this property.

In support of its request for injunctive relief, the University contends that AFRH is without authority to proceed with the solicitation because the proposed disposition of property would: (i) occur beyond a one-year action period specified in relevant legislation; (ii) involve AFRH in a form of land development that violates a statutory prohibition against public-private partnerships; and (iii) extinguish the University's right to acquire the property by matching the highest bona fide offer for the property. Additionally, the University claims that the solicitation is unlawful because it improperly favors offerors other than the University.

Defendant disagrees with each of plaintiff's assertions. Additionally, defendant contends that the court is without jurisdiction to hear the case because—according to defendant— our injunctive authority under 28 U.S.C. § 1491(b) is restricted to challenges concerning government procurement activities, i.e., activities directed towards the acquisition of property or services by the Government, and not to activities such as those contemplated in the instant solicitation that include the possibility of the Government's disposition of property. Accordingly, defendant has moved for dismissal of the suit for lack of subject matter jurisdiction and, in the alternative, for summary judgment on the basis of the administrative record. Plaintiff has cross-moved for summary judgment. The issues have been fully briefed by the parties and oral argument was heard on July 12, 2001.

At the conclusion of the oral argument, the court entered a partial bench ruling holding that it had jurisdiction to hear the matter and, further, that the timing provision of the statute in question did not deprive AFRH of the authority to dispose of the property. The court additionally ruled that the University's statutory right to acquire the property by matching the highest bona fide offer is a reference to price only, and therefore the University could not be required to participate as a developer-offeror in the solicitation process in order to preserve its opportunity to acquire the property. Left open was the question of whether the development scheme envisioned by the solicitation represented a prohibited public-private partnership—an inquiry we now answer in the negative. In this opinion, we explain the basis for these rulings in more detail.

## BACKGROUND

The United States Soldiers' and Airmen's Home, located in Washington, D.C., has provided a residence and related services for military veterans since 1851. This facility, together with the United States Naval Home (located in Gulfport, Mississippi), was incorporated into an independent establishment within the Executive Branch in 1990. The consolidated institution—the Armed Forces Retirement Home—is administered by the Armed Forces Retirement Home Board ("AFRHB"). 24 U.S.C. § 411 (1994).

Budgets for AFRH, while approved by Congress, do not come from general revenues, but are instead drawn from a separate trust fund. Income of the trust fund is derived, in the main, from fifty-cents-per-month deductions from active duty service members, and fines imposed on military personnel for Uniform Code of Military Justice violations, supplemented by residents' fees, bequests and interest paid on the investments of the fund. 24 U.S.C. § 419 (1994).

For roughly the past decade, the Armed Forces Retirement Home has been experiencing declining revenues and, despite efforts to reduce costs, has been unable to avoid incurring annual budget deficits. In an effort to address this expected continuation in revenue decline, AFRHB, acting pursuant to congressional authority, contracted with Coopers and Lybrand, L.L.P. to identify and evaluate alternatives for the modernization and long-term viability of the retirement facilities. Among the proposals made by Coopers and Lybrand was a recommendation to sell a 49-acre parcel of excess land located in Washington, D.C. that was owned by the Soldiers' and Airmen's Home. To implement this recommendation, AFRHB subsequently requested legislation that would authorize the sale of this excess property and, in section 1053 of the National Defense Authorization Act for Fiscal Year 1997, that authorization was provided: "the Armed Forces Retirement Home Board may convey, by sale or otherwise, all right, title, and interest ... in a parcel of real property ... consisting of approximately 49 acres located in Washington, District of Columbia ...." Pub.L. No. 104–201, § 1053, 110 Stat. 2422, 2650 (1996).

Two years later, Congress revisited AFRHB's authorization to sell the parcel, essentially directing that the property be sold to Catholic University:

> The sale ... shall be made to a neighboring nonprofit organization from whose extensive educational and charitable services the public benefits and has benefited from for more than 100 years, or an entity or entities related to such organization, and whose substantial investment in the neighborhood is consistent with the continued existence and purpose of the Armed Forces Retirement Home.

Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, Pub.L. No. 105–261, § 1043, 112 Stat.1920, 2125 (1998). The statute directed this sale to be made in exchange for a payment "equal to the fair market value of the real property at its highest and best economic use, as determined by the Armed Forces Retirement Home Board, based on an independent appraisal." *Id.*

Notwithstanding the enactment of § 1043 (the statute quoted immediately above), in March 1999 Congress again focused its attention on the property. In a hearing held before the Military Readiness Subcommittee of the House Armed Services Committee on March 17, 1999, AFRHB's chairman, David

F. Lacy, testified that, pursuant to the contemplated sale of the property (as specified in § 1043), AFRHB had requested the Army Corps of Engineers to award and administer a contract for the independent appraisal of the property. Mr. Lacy further explained that AFRHB had also enlisted the aid of the private sector to conduct an in-depth study and offer recommendations on how to maximize the value realizable from the property. The result of this latter effort—Mr. Lacy went on to say—was the identification of a development plan in which the Armed Forces Retirement Home would act neither as a developer nor as a speculator. Rather, the witness stated: "The Armed Forces Retirement Home would offer ground leases, with improvements reverting to the Home at lease termination. The risks of the marketplace would be borne by the private sector leaseholders." National Defense Authorization Act for Fiscal Year 2000: Hearings on Title III of H.R. 1401 Before the House Committee on Armed Services, Military Readiness Subcommittee, 106th Cong. 1285 (March 17, 1999) ("Subcommittee Hearings").

In further explanation of this dual approach to the property's valuation, Mr. Lacy added the following:

> On completion of the appraisal, our desire is to put the land up for competitive bids, and then to compare the bids with the present value of the income stream and residual values associated with the extended lease option, assuming the financial parameters of that option are validated by the independent appraisal. The Board would then hope to be in a position to execute whatever option produces the most long-term value for our Trust Fund and, thus, for the current and future veterans who are its beneficiaries.

*Id.* at 1286–87.

In his testimony, Mr. Lacy acknowledged that disposition of the property through a lease option, as opposed to a sale, would require specific legislative authority. He therefore added:

> We fully understand that to pursue this course requires some modification to current law, and the Congress would have to provide legislative authority to permit us

to sell, lease, or otherwise dispose of the property, based on the outcome of this process.

*Id.* at 1287.

In response to the views expressed at the hearing, Congress passed a "Clarification of Land Conveyance Authority" in 1999, directing that the authority to "convey by sale" be replaced with the authorization to "convey, by sale or lease." National Defense Authorization Act for Fiscal Year 2000, Pub.L. No. 106-65, § 384(a), 113 Stat. 512, 584 (1999). AFRHB was further granted the authority to "determine the manner, terms, and conditions" of the conveyance so long as (i) any lease included an option to purchase; (ii) the conveyance did not include any form of public-private partnership; (iii) Catholic University was given an opportunity to match or exceed the highest bona fide offer; and (iv) the conveyance was for no less than the value of the property appraised at its highest and best use. *Id.* § 384(c). The amendment additionally specified, however, that the "Armed Forces Retirement Home Board shall sell or lease the property . . . within 12 months after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2000." *Id.* § 384(b).

On June 22, 2000, AFRHB approached the University with an offer to lease the property, on a non-competitive basis, for a 50–year term at an annual rate of $2.81 million (with later, appraisal-based increases in lease payments). The offer was rejected. In December 2000, AFRHB then proceeded to issue a solicitation requesting proposals for the development of the parcel. According to an amendment to the solicitation, the University would have thirty days, after the selection of the best offer, either to "submit a proposal entirely consistent with the RFP that meets or exceeds the proposal of the selected developer, or agree to implement the selected developer's proposal in its entirety." The University filed suit in this court on April 30, 2001.

## DISCUSSION

### I.  Jurisdiction

■ We begin our discussion with defendant's contention that the court does not

have jurisdiction to grant injunctive relief in the present case. In defendant's view, the statute that grants us injunctive authority, 28 U.S.C. § 1491(b) (1994), is limited to suits challenging the Government's procurement activities, and does not extend to suits involving the Government's sale or lease of real property. Such contracts, defendant maintains, are beyond the reach of our equitable powers.

Defendant bases its interpretation on the final clause of § 1491(b)(italicized in the statutory text that follows):

> Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation *in connection with a procurement or a proposed procurement.* (Italics added.)

Defendant contends that this language—"in connection with a procurement or proposed procurement"—defines the context in which the statute is meant to operate. The clause, in other words, is designed to modify each of the phrases that precede it, such that an interested party may object to: (i) a solicitation in connection with a procurement or proposed procurement; (ii) a proposed award in connection with a procurement or proposed procurement; (iii) an actual award in connection with a procurement or proposed procurement; or (iv) any alleged violation of statute or regulation in connection with a procurement or proposed procurement. Actions unrelated to a procurement, defendant concludes, do not fall within this court's jurisdiction.

While we accept defendant's contention that § 1491 is a provision governing the procurement process, we are unable to give the term procurement so narrow a construction as to exclude the present case. We reach that conclusion based both on the historical scope of the court's injunctive authority under § 1491; and on the absence of any indication in the legislative history of the court's current injunction statute that Congress intended to narrow that scope. We explain further.

This court was first granted injunctive authority at the same time its statutory predecessor—the United States Claims Court—was established as an independent trial court under Article I of the Constitution. Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, § 133(a), 96 Stat. 25, 39-40. Where the prior institution had the authority to redress unlawful government action in the bid solicitation process only through an award of bid preparation costs, *see Heyer Products Co. v. United States*, 135 Ct.Cl. 63, 140 F.Supp. 409, 413 (1956), the new court was given the broader power to "afford complete relief on any contract claim brought before the contract is awarded." Toward that end, Congress conferred on the court "exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief."

In its exercise of this injunctive authority, the court drew no distinction between claims relating to a solicitation for the Government's acquisition of supplies or services, and claims relating to a solicitation involving the Government's disposition of assets. *Compare, e.g., Mack Trucks, Inc. v. United States*, 6 Cl.Ct. 68 (1984) (bidder's challenge to Postal Service's decision to reject bid, for lack of responsiveness, in solicitation for manufacture of trucks) *with Prineville Sawmill Co. v. United States*, 859 F.2d 905 (Fed.Cir.1988) (successful bidder's challenge to Forest Service's decision to re-solicit bids for sale of salvage timber). The court's injunctive authority, in other words, paralleled its authority to grant monetary relief on any contract claim.

The court's injunction statute was amended in 1996. Section 12 of the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104-320, 110 Stat. 3870, 3874, sets forth the current text of § 1491 which reads, in relevant part, as follows:

> Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Fed-

eral agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.[1]

28 U.S.C. § 1491(b)(1).

In explaining the reason for the change to the court's injunctive authority, Senator Cohen of Maine, the bill's principal sponsor, stated:

The amendment deals with the issue of bid protest jurisdiction in the Federal district courts and the U.S. Court of Federal Claims. The amendment will expand the bid protest jurisdiction of the Court .of Federal Claims. It should be noted, however, that this amendment in no way expands the jurisdiction of the Court of Federal Claims beyond bid protests or changes the standard of review in any other area of jurisdiction of the Court of Federal Claims.

Currently, the Court of Federal Claims only has jurisdiction over bid protests which are filed before a contract award is made. My amendment provides for both pre- and post-award jurisdiction.

142 Cong. Rec. S11848–50 (daily ed. Sept. 30, 1996).

It is apparent from the text of Senator Cohen's remarks that the amendment of § 1491 was not intended to narrow the court's injunctive authority but, rather, to expand that authority to embrace post-award challenges to government solicitations. And, in that connection, it is important to note the senator's description of the bill as relating to the court's "bid protest" jurisdiction—a designation that, as we have indicated, extended to any pre-award challenge to the Government's conduct of a solicitation or contract award irrespective of whether the Government was engaged in the acquisition or the disposition of property.

Because § 1491's legislative history offers such an unequivocal expression of congressional purpose, we think it reasonable—indeed, necessary—to read the word "procurement" in section 1491 not in the limited sense of referring just to the Government's acquisition of supplies or services, but rather as a more general reference to the process by which the Government endeavors to fulfill any of its needs through the mechanics of a solicitation and contract award. That such a definition for the term procurement would not be out-of-step with common usage is evident from the solicitation in question here: its announcement in the December 22, 2000 *Commerce Business Daily* appeared under the heading of "U.S. Government Procurements."

In *Osborne v. San Diego Land and Town Co.*, 178 U.S. 22, 38, 20 S.Ct. 860, 44 L.Ed. 961 (1900), the Supreme Court had occasion to say that "one definition of a word does not express its whole meaning or necessarily determine the intention of its use." Were we to accept defendant's narrow reading of the term procurement, we would be forced to exclude cases over which Congress clearly intended us to exercise continued jurisdiction. This we cannot do.

## II. The One–Year Action Requirement

■ Turning, then, to the merits of the case, we begin with plaintiff's allegation that AFRHB lacks the authority to sell the property since the time in which it was empowered to do so has expired. As earlier-noted, § 384 of the National Defense Authorization Act for Fiscal Year 2000, provides, *inter alia,* that "[t]he Armed Forces Retirement Home Board shall sell or lease the property ... within 12 months after the date of the enactment of [this Act]." The referenced defense authorization statute was enacted on October 5, 1999; to date, however, AFRHB has not yet leased or sold the property.

Plaintiff contends that it is now too late for AFRHB to act. By the terms of the statute, plaintiff argues, AFRHB was required to sell

---

1. In accordance with the "sunset" provision contained in Section 12(d) of Public Law 104–320, district court jurisdiction under 28 U.S.C. § 1491(b) terminated on January 1, 2001. 110 Stat. 3875.

or lease the property within the twelve-month period following the statute's enactment, and having failed in that regard, is now without authority to enter into any contract to dispose of the property. Accordingly, we are urged to enjoin AFRHB from proceeding with the solicitation.

In response, defendant argues that if Congress had intended the statutory language to serve as a time limitation on AFRHB's authority to sell or lease the property, it would have said so directly by noting, as it did in the case of other authorizations contained in the same statute, that the authority to act expired at the end of the stated period. Cited as examples are § 1017(d), 113 Stat. at 744 ("[t]he authority to transfer a vessel under subsection (a) shall expire at the end of the two-year period beginning on the date of the enactment of this Act"); § 2701(a), 113 Stat at 841 ("all authorizations ... for military construction projects, land acquisition, family housing projects and facilities ... shall expire on ...."); and § 3242(e), 113 Stat. at 965 ("[t]he authority provided in subsection (a) [regarding early retirement for certain Department of Energy employees] shall expire on ...."). Based on these examples, defendant contends that we may properly conclude that Congress intended the language in § 384 to be directory rather than mandatory.

We agree with defendant's assertion. In *St. Regis Mohawk Tribe, New York v. Brock*, 769 F.2d 37 (2nd Cir.1985), the court addressed the issue of whether an administrative order directing repayment to the Government of misspent federal grant funds was rendered unenforceable because of the Secretary's failure to comply with the statutory time limits that required the Secretary to "make the final determination ... not later than 120 days after receiving the complaint." There, the plaintiff argued that Congress' use of the word "shall" indicated that it meant the time provision to be mandatory. Any other interpretation, the *St. Regis* plaintiff argued, would render the 120–day deadline unenforceable and therefore meaningless.

The Court of Appeals rejected this argument, saying:

The Tribe puts on the word "shall" a weight it cannot bear in the present context. In numerous cases construing similar statutes directing that administrative action "shall" be completed within a specified time, courts have enunciated a general rule that

> [a] statutory time period is not mandatory unless it *both* expressly requires an agency or public official to act within a particular time period *and* specifies a consequence for failure to comply with the provision.

769 F.2d at 41 (citation omitted). The basis for this rule, the court went on to explain, was "the principle that disfavors sacrificing the public interest because of the negligence of public officers." *Id.* at 46.

Plaintiff contends, however, that this rationale—the avoidance of harm to the public interest—is not a compelling consideration in this case. To the contrary, plaintiff argues, enforcement of the statute's one-year time limit would only mean that AFRHB would have to seek renewed authority from Congress to sell or lease the property. And aside from that additional effort, in plaintiff's view, no lasting injury would occur.

We cannot accept this argument. Without question, AFRH's status as a residential retirement community for the nation's soldiers and sailors fulfills an important public purpose. The continued accomplishment of that purpose, as we earlier pointed out, is under threat because of ongoing budget deficits. Those deficits can be alleviated (though only in part) through the realization of income from the property. Time, therefore, is of the essence. Thus, it is a fair surmise to say that Congress, well-knowing of AFRH's need for income, intended the statute's one-year time period, not as a time-limited authorization for AFRHB to act, but rather as an exhortation that AFRHB act promptly. We so hold.

III. The Prohibition on Public–Private Partnerships

■ In further challenge to the solicitation, plaintiff next argues that the proposed leasing arrangement represents a public-pri-

vate partnership and is thus prohibited by statute. Section 384(c)(1)(B) of the National Defense Authorization Act for Fiscal Year 2000 provides that "the conveyance [of the 49 acres] may not involve any form of public/private partnership, but shall be limited to fee-simple sale or long-term lease." In plaintiff's view, AFRHB's oversight of land development process, its proposed profit-sharing with the commercial developer, and its receipt of and responsibility for the development in the event of lease default place the proposed development plan squarely within the category of prohibited partnerships. On that ground alone, plaintiff argues, the solicitation must be enjoined.

Plaintiff finds further support for its position in *Public–Private Partnerships, Terms Related to Building and Facility Partnerships,* an April 1999 publication of the General Accounting Office ("GAO"). The GAO defines a public-private partnership as "a contractual arrangement ... between public- and private-sector partners" that "typically involve[s] a government agency contracting with a private partner to renovate, construct, operate, maintain, and/or manage a facility or system, in whole or in part, that provides a public service." *Public–Private Partnerships, Terms Related to Building and Facility Partnerships,* GAO/GGD—99–71 at 13–14. The GAO publication goes on to characterize public-private partnerships as ones in which the private party "generally invests its own capital to design and develop the properties" and "makes a substantial cash, at-risk, equity investment in the project" with the public partner sharing in the income or revenues "without having to pay the private-sector partner." *Id.* at 14. That language, plaintiff contends, perfectly describes the business arrangement envisioned by the solicitation, rendering the proposed leasing agreement a prohibited private-public partnership.

A review of the legislative history, however, reveals that the leasing arrangement anticipated by the solicitation was not the sort of proposal with which Congress was concerned when it sought to bar public-private partnerships. In discussing the development proposal then before it—a precursor to the solicitation that nonetheless envisioned a ground-lease to a private developer—members of the subcommittee focused repeatedly on the risk any development scheme would pose to the Home's assets. And it is that concern, we believe, that the public-private partnership prohibition was intended to address.

In a letter submitted for the record to the Subcommittee on Military Readiness, for instance, Senator Rick Santorum of Pennsylvania, sponsor of the earlier provision directing the sale of the property to the University, expressed his desire to maintain "stable and reliable financial support" for the Home with a "guaranteed income," in contrast to the "substantial risk" and the "possibility of income loss" associated with the development of acreage as part of a public-private partnership. Subcommittee Hearings at 1349.

Congressman Duncan Hunter, a representative from California, echoed Senator Santorum's concern with risk, focusing on the extent to which the Home's capital would be implicated by the proposed development. "[M]ost participants that I see in contracting are folks that want to participate with your money," he cautioned AFRHB's Dr. Laurence Branch. "They are not going to ask you to subordinate your land to development costs?" he inquired of the plan. "So the land remains totally free, clear, and under your ownership?" *Id.* at 1293.

Assured by Dr. Branch that AFRHB did not intend to risk its assets in the development scheme, Congressman Hunter turned to the very issue of public-private partnerships:

> I know there is a lot of hesitancy on the Hill to become—to have a government agency become a business partner or co-developer. But what you are saying is that this is not a partnership, just straight-out long-term lease, and one in which you receive the ownership of any improvements that come on the property?

*Id.* at 1294.

Again assured by Dr. Branch that his understanding of the proposal was correct, Congressmen Hunter next attempted to confirm the distinction between the Home's proposed

long-term leasing arrangement and such partnerships: "So you are not risking a dime of your own capital? You are sure of that?" *Id.*

Congressman Herbert H. Bateman of Virginia, the chairman of the Military Readiness Subcommittee, also expressed his concern that the Home's assets not be put at risk: "If you were to go forward with a commercial development of the 49 acres, what assurances do you have that this speculative venture would provide as much revenue as an outright sale?" *Id.* at 1438.

In response to those concerns, Mr. Lacy explained to the Subcommittee that "the proposed role of the Armed Forces Retirement Home is that of grantor of ground leases to the private sector. There will be no cost of capital to the Armed Forces Retirement Home." *Id.* at 1439. He continued:

> The Armed Forces Retirement Home will not be a participant at risk in the execution of the business plan. The Armed Forces Retirement Home will be the grantor of land lease(s). From the perspective of the Armed Forces Retirement Home, failure of the project is the termination of the lease payments. Termination of lease payments will cause the reversion of the land and all improvements to the Armed Forces Retirement Home.

*Id.*

In follow-up, Mr. Bateman noted that "there is no assurance the development proposal will work. Like all investments, there is an element of speculation and risk. How does developing the land 'ensure that those aging veterans who need the Homes will not be disenfranchised'?" In response, Mr. Lacy reiterated "the Armed Forces Retirement Home will not place its assets at risk." *Id.*

As noted above, we understand these exchanges to reflect congressional intent that the Home's assets not be put at risk, and the subsequent prohibition on public-private partnerships, discussed in the context of risk allocation, as codifying that concern. The fact that Congress, assured that AFRHB would act merely as a lessor and not as a developer, granted it the authority to lease the land demonstrates its acceptance of the type of long-term leasing the solicitation envisions.

Nor do we believe, as plaintiff urges, that either AFRHB's oversight of the development proposals or the fact that the development would, in the event of default, become AFRHB's responsibility, moves the arrangement into the realm of prohibited private-public partnerships. The first condition merely reflects AFRHB's prudent monitoring of its property; the second, the natural—indeed unavoidable—consequence of *any* defaulted leasing agreement. The fact that Congress authorized a leasing arrangement, knowing that leases are on occasion subject to default, suggests to us that post-default management expenses were a level of risk Congress was willing to tolerate.

IV. Catholic University's Right to Match or Exceed the Highest Bona Fide Offer

█ We turn then to plaintiff's third objection to the solicitation—the contention that AFRHB, by requiring the University to submit a proposal "entirely consistent with the RFP that meets or exceeds the proposal of the selected developer, or agree to implement the selected developer's proposal in its entirety," improperly infringes on the University's statutorily-conferred right to acquire the property. In support of that position, plaintiff refers us to the National Defense Authorization Act for Fiscal Year 2000, Pub.L. No. 106–65, § 384(c)(1)(C), 113 Stat. 512, 584 (1999), which provides in relevant part:

> Before conveying the property by sale or lease to any other person or entity, the Board shall provide the Catholic University of America with the opportunity to match or exceed the highest bona fide offer otherwise received for the purchase or lease of the property, as the case may be, and to acquire the property.

That provision, in plaintiff's view, directs AFRHB to solicit from the University a *price* that matches or exceeds the highest offer, but does not authorize AFRHB to require the University's submission of a development plan matching or exceeding that offer. That is the case, plaintiff maintains, both because the plain language of the statute—*i.e.*, the

term "highest offer"—would seem to connote price, and because a requirement that the University commercially develop the land flies in the face of its explicit representation to Congress that it had no interest in the property for commercial development, but wanted it instead for the expansion of its own academic needs.

Defendant, by contrast, sees no such limitation in the term "highest offer," nor a contradiction between the solicitation's requirements and the University's needs. As to the first point, defendant argues that the term "offer" is generally defined as "a proposal to do a thing"—a reading consistent with requiring the University to submit a development proposal. Even in the event that the term is ambiguous, however, defendant urges us to uphold the agency's interpretation of the statute under the *Chevron* doctrine. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843–844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency"). Speaking to the second point, defendant assures us that the University need not propose a commercial development to become the successful acquiror: the University could instead offset its low scores on development factors by attaining higher scores on financial factors, thereby receiving an overall evaluation score that matches the highest bona fide offer.[2]

Of the two positions, plaintiff's, we believe, is the correct one. The fact that the University must match the highest—rather than best—offer suggests Congress intended the term "offer" to connote price. "Offer" is indeed defined as "a price at which one is ready to buy or sell," Black's Law Dictionary 1111 (7th ed.1999). And the fact that Congress established a minimum price for the property—defined as no less than "the appraised value of the property in its existing condition and on the basis of its highest and best use"—immediately after the provision

relating to the University's opportunity to match, further indicates that Congress contemplated the term offer to mean price.

A review of the legislative history, we believe, confirms this interpretation. During the hearings before the subcommittee, Congressman Hunter expressed his view that "if the church is willing to match what is a bona fide and real *price* that would be paid by others that I am sure that [AFRH] would look favorably on having their neighbor have the property." (Emphasis added.) Subcommittee Hearings at 1304. Congressman Hunter went on to characterize the University's "right of first refusal" as involving the question of "what price, and that would be based on whatever this fair market value is found to be." *Id.* at 1305. Similarly, Congressman Bateman focused on price without regard to development proposals by noting that "we do not want the church in a position where it has to pay some artificially inflated price in order to achieve its objectives." *Id.*

The fact that Congress made no mention of commercial development by the University is consistent with the University's representation of its intentions for the property. In his testimony before the subcommittee, for instance, Father David O'Connell (the University's president) explained that the University "seeks the 49 acre parcel of excess federal land to grow and expand its academic and research programs and to provide needed support for the university as a national research institution of higher learning." Subcommittee Hearings at 1444. Although allowing for the possibility of a leasing arrangement, the University rejected the notion of commercial development in no uncertain terms: "If we are to commit resources to fulfill this concept, we need to own the 49 acres. We cannot risk an uncertain partnership with a commercial developer." *Id.* at 1342. In light of those stated goals, and in light of the Subcommittee's professed desire to reconcile the needs of both the Home and the University, we cannot accept that Con-

---

2. The solicitation specifies that offerors, including the University, are to be evaluated on the basis of six selection criteria: (i) Development Program; (ii) Urban Design, Architecture, Transportation and Historic Preservation; (iii) Devel- opment Schedule; (iv) Development Experience and Capability; (v) Economic Feasibility, Financial Capability, and Financial Compensation; and (vi) Small Business Set–Asides/ First Source Employment Agreement Program.

gress expected, or even authorized, the University's offer under § 384 to take the form of a development proposal.[3]

Although our inquiry into the meaning of the term "offer" can safely end with the statute's plain language and the legislative history behind it, defendant could not win its point even if those sources were not so clear. *Nebblett v. Office of Pers. Mgmt.*, 237 F.3d 1353, 1357 (Fed.Cir.2001) (testing the reasonableness of an agency's statutory interpretation as required by *Chevron* only in the absence of legislative history illuminating congressional intent). This is not, as defendant maintains, a case in which the court is obliged to accord deference to an agency's interpretation under *Chevron*. Such deference is appropriate where a particular agency is the one with "historical familiarity and policy-making expertise" so as to render its interpretation more informed than one offered by the court. *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 153, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). Where, as here, no such agency expertise exists (AFRHB admittedly has no experience in property development or disposal), the court need not defer to its interpretation.

We therefore conclude that the University may only be asked to match (or exceed) the highest offeror's price, and may not, consistent with the statutory grant of authority, be required to submit a competitive development proposal.

## V. Reimbursement to a Displaced Offeror

■ In its final challenge to the solicitation, plaintiff argues that a solicitation term that provides for a $275,000 payment to the selected developer in the event that the University acquires the property is both arbitrary and unfair. In plaintiff's view, this compensatory payment scheme provides an incentive to offerors to drive up the price of the offers the University might seek to match. Additionally, plaintiff complains that the payment is unfair because no comparable

payment will be made to the University in the event its proposal is unsuccessful. Plaintiff describes this payment scheme as "blatant unequal treatment that is *per se* arbitrary and capricious."

We think plaintiff's criticisms are off the mark. The $275,00 "consolation" payment is awarded only if the selected developer does not in fact receive the property because the University has acquired it instead. Should the selected developer actually acquire the property, no such payment is made. A developer would therefore have no incentive to alter his bid in any fashion—including artificially raising it—because the bid, by definition, takes effect (i.e., forms the basis for a contract) only when the $275,000 is no longer available. Self-interest and the discipline of the marketplace would surely deter any offeror from submitting a proposal whose economic merit was distorted by the desire to "outbid" the University. A bidder engaged in such a game would lose by winning.

Plaintiff's other argument—that the payment scheme is unfair because it only compensates the displaced selectee and not also the University were it to fail in its bid to acquire the property—reflects a misunderstanding of the purpose of the payment. As defendant's brief explains, the payment was not intended as compensation to the loser. Rather, it was designed to achieve a measure of fairness—and thereby to preserve bidder interest—in a solicitation process in which the University enjoyed the built-in advantage of being able to declare itself the winner by matching the highest bona fide offer. Far from being unfair then, the payment scheme is an eminently sensible way, not of disadvantaging the University, but of compensating an otherwise successful offeror for the University's unique advantage.

## CONCLUSION

Based on the reasoning articulated at the conclusion of oral argument and the rationale contained herein, the court holds that the solicitation is lawful except to the extent that

---

3. Defendant's argument that the proposal need not include commercial development does not change our conclusion. Its suggestion that the University make up in the price component what

it lacks in the development factors when financial factors constitute no more than 25% of the overall score would essentially render the University's "right of first refusal" without effect.

it requires the University to participate as a developer-offeror in the solicitation process in order to preserve its opportunity to acquire the property. As to this last, AFRH is permanently enjoined from requiring the University to participate as a developer-offeror in the solicitation process in order to preserve its eligibility to acquire the property.

Accordingly, plaintiff's Motion for Summary Judgment on the Administrative Record is denied in part and granted in part; defendant's Motion to Dismiss for Lack of Jurisdiction is denied, and defendant's Motion for Summary Judgment is granted in part and denied in part, consistent with the views expressed in this opinion.

Consistent with the foregoing, the Clerk is directed to enter judgment in favor of defendant except to the extent that defendant is permanently enjoined from requiring the University to participate as a developer-offeror in the solicitation process in order to preserve its eligibility to acquire the property.